# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NML CAPITAL, LTD.,
c/o Maples Corporate Services Limited
PO Box 309, Ugland House
Grand Cayman
KY1-1104
Cayman Islands

        Plaintiff,

v.

THE REPUBLIC OF ARGENTINA,
c/o Banco de la Nación Argentina
225 Park Avenue
New York, NY 10169

        Defendant.

Miscellaneous Case No.

(This action is currently pending in the United States District Court for the Southern District of New York as Case Numbers 03 Civ. 8845 (TPG), 05 Civ. 2434 (TPG), 06 Civ. 6466 (TPG), 07 Civ. 1910 (TPG), 07 Civ. 2690 (TPG), 07 Civ. 6563 (TPG), 08 Civ. 2541 (TPG), 08 Civ. 3302 (TPG), 08 Civ. 6978 (TPG), 09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG))

---

## PLAINTIFF NML CAPITAL, LTD.'S MEMORANDUM IN SUPPORT OF EMERGENCY MOTION TO COMPEL COMPLIANCE WITH SUBPOENA

Dated: November 4, 2014

DECHERT LLP

Dennis H. Hranitzky
(Bar No. NY0117)
Debra D. O'Gorman (pro hac to be submitted)
1095 Avenue of the Americas
New York, New York  10036
Tel. (212) 698-3500
Fax. (212) 698-3599

STINSON LEONARD STREET LLP

Steven K. White (Bar No. 367371)
Lawrence P. Block (Bar No. 452190)
1775 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006-4605
Tel: (202) 728-3024
Fax: (202) 572-9963

*Attorneys for Plaintiff*
*NML Capital, Ltd.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS .................................................................... 4

I.    Argentina's Default And Willful Judgment Evasion ........................... 4

II.   NML's Judgments and Claims Against Argentina ............................. 7

III.  Forcieri's Role In The Ciccone Scheme ...................................... 8

    A.   Background On Ciccone Calcografica ....................................... 8

    B.   Boudou And His Associates Orchestrate The Illegal Takeover Of
       Ciccone ................................................................ 9

    C.   Other Investigations Of Boudou .......................................... 12

IV.   NML's Subpoena To Forcieri ................................................ 14

ARGUMENT ............................................................................. 15

I.    Forcieri Has Waived Any Objections To The Subpoena......................... 16

II.   The Information Sought By The Subpoena Is Proper Under Rule 69(a)(2). ..... 17

III.  Forcieri's Intention To Invoke His Fifth Amendment Privilege  Does Not Excuse
      Him From Complying With The Subpoena..................................... 20

IV.   The Court Should Hold Forcieri in Contempt And Enjoin Him From Leaving The
      United States Until He Fully Complies With The Subpoena. ................ 22

CONCLUSION........................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

\*[1]     *Cadlerock Joint Venture L.P. v. MacPherson,*
        No. 09 Civ. 9970, 2011 WL 1795312 (S.D.N.Y. May 4, 2011) ............................ 21

*Daval Steel Prods. v. M/V Fakredine,*
        951 F.2d 1357 (2d Cir. 1991) ................................................................................ 23

*EM Ltd. v. Republic of Argentina,*
        473 F.3d 463 (2d Cir. 2007) .................................................................................... 5

\*       *EM Ltd. v. Republic of Argentina,*
        695 F.3d 201 (2d Cir. 2012) ......................................................................... 1, 7, 17

*EM Ltd. v. Republic of Argentina,*
        720 F. Supp. 2d 273 (S.D.N.Y. 2010), *vacated on other grounds,* 652 F.3d 172
        (2d Cir. 2011) ........................................................................................................ 1, 6

\*       *Falicia v. Advanced Tenant Servs., Inc.,*
        235 F.R.D. 5 (D.D.C. 2006) ............................................................................ 17, 18

*Fudali v. Pivotal Corp.,*
        No. 03-1460, 2010 WL 4910263 (D.D.C. Dec. 2, 2010) ...................................... 18

*Fulmer v. Bullard,*
        842 F.2d 1290 (4th Cir. 1988) ............................................................................... 21

*Garcia-Quintero v. Gonzales,*
        455 F.3d 1006 (9th Cir. 2006) ............................................................................... 21

*GFL Advantage Fund, Ltd. v. Colkitt,*
        216 F.R.D. 189 (D.D.C. 2003) .............................................................................. 18

*Herbstein v. Bruetman,*
        241 F.3d 586 (7th Cir. 2001) ................................................................................. 24

*In re Boland,*
        79 F.R.D. 665 (D.D.C. 1978) ................................................................................ 23

\*       *In re Denture Cream Prods. Liab. Litig.,*
        292 F.R.D. 120 (D.D.C. 2013) .............................................................................. 16

*In re Guyana Dev. Corp.,*

---

[1] In compliance with Local Rule 7(a), asterisks have been placed in the margin to the left of those authorities on which NML's counsel chiefly relies.

      201 B.R. 462 (Bankr. S.D. Tex. 1996)................................................................24

*In re Krause,*
      367 B.R. 740 (Bankr. D. Kan. 2007) .................................................................24

*In re Various Grand Jury Subpoenas,*
      924 F. Supp. 2d 549 (S.D.N.Y. 2013)...............................................................22

*Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc.*
      No. 05-1532, 2007 WL 3101248 (D. Nev. 2007) .............................................24

*Mellott v. MSN Commc'ns,*
      No. 09-2418, 2010 WL 5110136 (D. Colo. Dec. 8, 2010)................................24

*Merrill Lynch Bus. Fin. Servs., Inc. v. Kupperman,*
      No. 06–4802, 2007 WL 2300737 (D.N.J. Aug. 7, 2007)..................................24

\*    *Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC,*
      286 F.R.D. 8 (D.D.C. 2012) ..............................................................................17

   *NML Capital, Ltd. v. Banco Central de la República Argentina,*
      652 F.3d 172 (2d Cir. 2011).............................................................................1, 6

\*    *NML Capital Ltd. v. Republic of Argentina,*
      No. 2-14-cv-492-RFB-VCF, 2014 WL 3898021 (D. Nev. Aug. 11, 2014).......19, 20

   *NML Capital, Ltd. v. Republic of Argentina,*
      699 F.3d 246 (2d Cir. 2012)................................................................................5

   *Philips Med. Sys. Int'l, B.V. v. Bruetman,*
      982 F.2d 211 (7th Cir. 1992).............................................................................24

\*    *Republic of Argentina v. NML Capital, Ltd.,*
      134 S. Ct. 2250 (2014) .......................................................................................19

   *SEC v. Parkersburg Wireless LLC,*
      156 F.R.D. 529 (D.D.C. 1994)...........................................................................20

\*    *Smith v. Mallick,*
      No. 96-cv-2211, 2006 WL 2571830 (D.D.C. Sept. 6, 2006) ...........................17

   *Sullivan v. Ross Mech., Inc.,*
      No. 10 C 8069, 2012 WL 2254203 (N.D. Ill. June 15, 2012)...........................17, 18

\*    *Tuite v. Henry,*
      98 F.3d 1411 (D.C. Cir. 1996) ..........................................................................17

   *U.S. v. Barnette,*

129 F.3d 1179 (11th Cir. 1997)................................................................................24

*U.S. v. Brumfield,*
188 F.3d 303 (5th Cir. 1999)....................................................................................24

\*     *U.S. v. Hubbell,*
530 U.S. 27 (2000)....................................................................................................22

*Walker v. Ctr. for Food Safety,*
667 F. Supp. 2d 133 (D.D.C. 2009) ........................................................................23

**Statutes**

Argentine Criminal Code Art. 23....................................................................................12, 16, 18

Federal Rule of Civil Procedure 45 ............................................................................4, 16, 22, 23

Federal Rule of Civil Procedure 69 .............................................................................3, 7, 16, 17

U.S. CONST. amend. V....................................................................................4, 15, 20, 21, 23

**Other Authorities**

Wright & Miller, 8 Fed. Prac. & Proc. Civ. § 2018 (3d ed.) .........................................................21

## PRELIMINARY STATEMENT

Plaintiff NML Capital, Ltd. ("NML") holds judgments and claims against the Republic of Argentina ("Argentina") totaling nearly $3 billion that Argentina indisputably has the means to pay.  In its contract to borrow money on which NML's claims and judgments are based, Argentina "irrevocably waived" its sovereign immunity from attachment, execution, or "any other legal or judicial process or remedy" in the United States courts.  *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 203 n.1 (2d Cir. 2012).  Argentina thus has no excuse for refusing to pay or to negotiate in good faith the debts it owes to creditors under that agreement.  Yet it obdurately refuses to do so—engaging instead in a pattern of what the Second Circuit has described as "willful defiance of [its] obligations to honor the judgments of a federal court." *NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 196 (2d Cir. 2011) (citation omitted).

Argentina has engaged in elaborate mechanisms to shield its assets.  As the federal courts have recognized, it has acted in "bad faith," seeking to work a "fraud" on its creditors, by hiding assets in corporate shells with which "there is no real separation" so long as Argentina "wishes to use the funds" but, when its creditors seek the assets, then "the situation shifts and a wall of separation suddenly appears." *EM Ltd. v. Republic of Argentina*, 720 F. Supp. 2d 273, 280 (S.D.N.Y. 2010), *vacated on other grounds*, 652 F.3d 172 (2d Cir. 2011).  This bad faith behavior has left NML with little choice but to track Argentina's assets around the world and attempt to attach them as local laws permit.  To aid these efforts, NML has pursued post-judgment discovery under Federal Rule of Civil Procedure 69(a)(2) seeking, among other things, information regarding Argentine assets around the world.

By this emergency motion, NML seeks an order compelling César Guido Forcieri, an Argentine national currently residing in the United States, (1) to comply with a subpoena and produce documents that may point to the location of Argentina's assets in the United States or abroad, and (2) to appear immediately for a deposition at which his knowledge of the identity and location of potential Argentine assets can be explored.  NML also seeks a contempt order barring Forcieri from leaving the United States and requiring him to relinquish his passport until he complies fully with the subpoena.[2]

Forcieri, who was recently relieved of his position as Executive Director for Argentina, Bolivia, Chile, Paraguay, Peru and Uruguay at The World Bank, is widely known to be a close associate of Argentine Vice President, Amado Boudou.  Both Forcieri and Boudou were recently indicted in Argentina for their involvement in the illicit takeover of Ciccone Calcográfica ("Ciccone")—an Argentine printing company which had lucrative contracts to print Argentine currency.[3]  According to their respective indictments, with Forcieri's assistance, Boudou illegally abused his powers as a public official to place Ciccone under the control of his business associates.

Forcieri is closely tied to Boudou, having been appointed by Boudou to positions of increasing prominence as Boudou rose through the ranks of Argentine government—including

---

[2]     As is more fully explained below and in the accompanying Declaration of Dennis H. Hranitzky, dated on November 4, 2014 ("Hranitzky Decl."), Forcieri's counsel has advised that Forcieri intends to depart from the United States permanently and return to Argentina on November 8, 2014.  Accordingly, his immediate compliance with the subpoena is critical.

[3]     Hranitzky Decl. Ex. A; http://www.perfil.com/politica/Lijo-proceso-a-Boudou-y-a-otros-cinco-imputados-por-el-negociado-de-Ciccone-20140628-0964.html (visited October 23, 2014); Hranitzky Decl. Ex. Q; http://www.clarin.com/politica/Caso_Ciccone-Amado_Boudou-Guido_Forcieri-procesamiento-Ariel_Lijo _0_1206479830.html (visited October 23, 2014).

serving as Boudou's chief of staff while Boudou was Minister of the Economy in Argentina. According to Forcieri's indictment, he played a critical role in the elaborate Ciccone takeover scheme orchestrated by Boudou. The indictment asserts that Forcieri gave the orders to deny credit to Argentina's national mint, derailing its year and a half long efforts to purchase its own printing equipment and become self-sufficient, thereby steering business to Ciccone.[4]

If Argentine courts find that Boudou illegally seized control over the printing company, then Argentina may confiscate any profits, funds or other property employed in the takeover scheme. Any disgorged funds or property would then become Argentine state property potentially available to satisfy NML's nearly $3 billion in judgments and claims against Argentina.

Through a subpoena duces tecum and ad testificandum served on Forcieri on September 10, 2014 (the "Subpoena"),[5] NML seeks information calculated to assist in tracing those funds and property. The documents and information sought by NML pursuant to the Subpoena thus fall squarely within the scope of asset discovery contemplated under Rule 69(a)(2) of the Federal Rules of Civil Procedure—which permits a judgment creditor like NML to "obtain discovery from any person" "[i]n aid of the judgment or execution." Fed. R. Civ. P. 69(a)(2).

As explained below, although given his involvement in the Ciccone scheme Forcieri could be expected to have documents and information responsive to the Subpoena, he has made

---

[4] Hranitzky Decl. Ex. B; Forcieri Indictment, National Judicial Branch, Federal Criminal and Correctional Court No. 4, at p. 138. The indictment alleges "Guido Forcieri, acting as Chief of Staff of said Ministry, acted as the frequent nexus between La Casa de la Moneda and the Ministry of Economy, in addition to having transferred the rejection of the required guarantee required to obtain the loan, jointly with Boudou."

[5] The Subpoena, along with proof of service, is annexed to the Hranitzky Decl. as Ex. C.

the implausible claim that he has only one responsive document.  He also failed to appear for his deposition on the date noticed, and has not offered to make himself available on another mutually-convenient date prior to his planned permanent departure from the United States on November 8, 2014.  Although Forcieri never formally objected to the Subpoena (and thus waived any objections to complying with it), his counsel has informed NML that, if deposed, he will invoke his privilege against self-incrimination under the Fifth Amendment of the United States Constitution.[6]  NML's efforts to meet and confer with Forcieri's counsel in the hope of resolving the dispute with respect to his compliance with the Subpoena have reached an impasse.[7]  Now, faced with Forcieri's imminent, permanent departure from the United States, NML is left with no alternative than to seek immediate judicial intervention.

As set forth fully below, NML respectfully requests that this Court compel Forcieri pursuant to Federal Rule of Civil Procedure 45 to comply immediately with the Subpoena by producing all responsive documents in his possession, custody or control, and by appearing for deposition prior to his departure from the United States.  NML also requests that the Court issue a contempt order enjoining Forcieri from leaving the United States and requiring him to relinquish his passport until he fully complies with the Subpoena.

## STATEMENT OF FACTS

### I.    Argentina's Default And Willful Judgment Evasion

In the words of the Second Circuit Court of Appeals, "Argentina has made many contributions to the law of foreign insolvency through its numerous defaults on its sovereign

---

[6] Hranitzky Decl. at ¶ ¶ 35, 37.

[7] *Id.* at ¶ 42.

obligations, as well as through what we might term a diplomacy of default." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007).  Its most recent round of contributions began in December 2001, when it declared a moratorium on payments on its external debts in violation of agreements with its creditors.  In 2004, Argentina announced a debt restructuring plan, on a take-it-or-leave-it basis, that provided bondholders with a recovery of less than 30 cents on the dollar.[8]  This unprecedentedly large 70%-plus "haircut" was almost twice the average discount of 36% on twenty other sovereign debt restructurings between 1990 and 2006, and was declared despite Argentina's ability to pay far more.[9]  Argentina's unreasonable unilateral offer is directly responsible for the litigation that has followed.[10]

Since its default, Argentina's economic fortunes have improved greatly.  It has enjoyed consistent and substantial fiscal and balance-of-payments surpluses, and it currently sits on tens of billions of dollars worth of foreign currency reserves.  *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 263 (2d Cir. 2012).  It also has a wealth of other assets that could be easily monetized.  Yet Argentina has steadfastly refuses to pay its creditors.  In the words of the court most familiar with its conduct, Argentina "has not acted honestly and in good faith to pay the debts which [it] has the ability to pay."  *EM Ltd.*, 720 F. Supp. 2d at 301.

---

[8]      Hranitzky Decl. Ex D; Hal S. Scott, *Sovereign Debt Default: Cry For the United States, Not Argentina,* at 3 (Wash. Legal Found., Working Paper No. 140) (2006);  Hranitzky Decl. Ex. E; Larry Rohter, *Argentina Announces Deal on its Debt Default*, N.Y. Times, Mar. 4, 2005, at C1.

[9]      Hranitzky Decl. Ex . D; Scott, *Sovereign Debt Default, supra* note 1, at 3; Hranitzky Decl. Ex. F; Arturo C. Porzecanski, *From Rogue Creditors to Rogue Debtors: Implications of Argentina's Default*, 6 Chi. J. Int'l L. 311, 321 (2005).

[10]     Hranitzky Decl. Ex . G; *Sovereign Defaults Series: The Role of Holdout Creditors and CACs in Sovereign Debt Restructurings*, Moody's Investors Service, April 10, 2013, at 5.

Proceedings to enforce judgments awarded against NML (and other creditors) are currently pending as related actions in the United States District Court for the Southern District of New York (the "New York Court"). The district judge who presides over those actions, Judge Thomas P. Griesa, repeatedly has found that Argentina has acted in bad faith and engaged in willful judgment evasion. To cite just one example, in an opinion finding Argentina's central bank to be the alter ego of Argentina (and thus liable for Argentina's debts), Judge Griesa observed:

> In all the years of litigation, the Republic has shown not the slightest recognition of [its] obligation to pay. And it is clear beyond any question that the Republic, as it went on from the crisis of 2001, has at times had resources at its command to pay the judgments, or at least to make substantial part-payments. But the Republic thus far pays *nothing* on these judgments.

*EM Ltd.*, 720 F. Supp. 2d at 279 (emphasis in original). The Second Circuit has echoed this sentiment. *See NML Capital*, 652 F.3d at 196 ("One need not have what Argentina's great gift to literature [Jorge Luis Borges] termed a 'case[] of prodigious memory' to recall the Republic's appalling record of keeping its promises to its creditors."). In perhaps the most egregious example of its contemptuous disregard for the federal courts, in an argument before the Second Circuit last year, Argentina's counsel informed the panel that Argentina would simply not comply with an order with which Argentina disagreed.[11] After Argentina subsequently made good on its promise to violate an injunction issued by the New York Court and affirmed *twice* by

---

[11]  Hranitzky Decl. Ex. H; Feb. 27, 2013 Hr'g Tr., *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105 (2d Cir. Oct. 26, 2012) ("*NML* Hr'g Tr."), at 12 (Counsel for Argentina: "I'm telling you [the order] wouldn't be voluntarily obeyed."). *see also NML Capital Ltd. v. Republic of Argentina*, 727 F.3d 230, 238 (2d Cir. 2013) ("[A]t the February 27, 2013 oral argument, counsel for Argentina told the panel that it 'would not voluntarily obey' the district court's injunctions, even if those injunctions were upheld by this Court.").

the Second Circuit, the New York Court took the exceptional step of holding the country in contempt.[12]

## II.    NML's Judgments And Claims Against Argentina

NML owns beneficial interests in bonds on which Argentina defaulted in 2001, and has filed eleven actions in the Southern District of New York to recover on those bonds.  The New York Court has entered money judgments in favor of NML currently totaling (with interest) more than $1.7 billion.  *EM Ltd.*, 695 F.3d at 203.  NML holds claims against Argentina to recover on an additional $1.2 billion.

As a consequence, NML has had no choice but to invoke the processes of the U.S. courts, as well as those in foreign jurisdictions, in a worldwide effort to identify and potentially seize attachable assets.  NML has employed post-judgment discovery under Rule 69 of the Federal Rules of Civil Procedure—which the Second Circuit has expressly condoned—seeking to "locate Argentina's assets and accounts, learn how Argentina moves its assets through New York and around the world, and accurately identify the places and times when those assets might be subject to attachment and execution (whether under [U.S. law] or the law of foreign jurisdictions)." *EM Ltd.*, 695 F.3d at 203 (citation omitted).  NML's discovery efforts endorsed by the Second Circuit and the U.S. Supreme Court have included service of subpoenas on various third-parties which, like Forcieri, are believed to have information relevant to locating Argentina's assets.  *Id.* at 208.

---

[12]    Hranitzky Decl. Ex. I; September 29, 2014 Order, *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 CV 6978; 09 CV 1707, 09 CV 1708 ("[T]he court holds that Argentina is in civil contempt of court").

III.     **Forcieri's Role In The Ciccone Scheme**

   A.     **Background On Ciccone Calcográfica**

Ciccone Calcográfica was founded in 1951 by Héctor and Nicolas Ciccone,[13] and over the next sixty years grew into one of the most successful printing companies in South America. The company's success was due largely to the fact that it is one of the only firms in the Southern Hemisphere with the advanced (and extremely expensive) printing equipment required to produce currency and other "high security" documents such as passports.[14] This unique capability brought Ciccone lucrative government printing contracts.

Ciccone had a series of financial setbacks in the 1990s and 2000s. In July 2010, after years of financial difficulties, the Argentine tax agency, *Administración Federal de Ingresos Públicos* ("AFIP") forced it into involuntary bankruptcy, claiming that Ciccone owed approximately 239 million pesos in unpaid taxes.[15] A few months into the bankruptcy process, AFIP and the bankruptcy court agreed to allow a company called The Old Fund to purchase Ciccone, following which Ciccone was to emerge from bankruptcy. The Old Fund acquired Ciccone and renamed it Compañía de Valores Sudamericana.[16]

As a result of the dispute with AFIP, the value of Ciccone plummeted. In 2009, before Ciccone was forced into bankruptcy, a French firm was willing to pay $10 million for the

---

[13]     Hranitzky Decl. Ex. J; http://www.lanacion.com.ar/1294186-quebro-ciccone-calcografica-y-la-operara-la-casa-de-moneda.

[14]     *Id.*

[15]     Hranitzky Decl. Ex. K; http://www.clarin.com/economia/Ciccone-quebro-Boldt-Casa-Moneda_0_319168121.html (visited October 23, 2014).

[16]     Hranitzky Decl. Ex. L; Excerpts of a book authored by Hugo Alconada Mon entitled "Los Secretos de la Valija," (in translation "Suitcase Secrets") published 2009, Grupo Editorial Planeta S.A.I.C., at p. 79-80.

company.[17] But by the time The Old Fund officially took control of Ciccone in 2010, The Old Fund was only required to pay the Ciccone family $50,000 per month in addition to assuming all of the firm's debts.[18]

**B.     Boudou And His Associates Orchestrate The Illegal Takeover Of Ciccone**

According to the Ciccone family, current Argentine Vice President Boudou engineered the takeover of Ciccone through his interest in The Old Fund with the assistance of an Argentine-Belgian attorney named Alejandro Vandenbroele, a childhood friend named José María Núñez Carmona, and Forcieri.[19] Nicolas Ciccone testified that Boudou forced the Ciccone family to hand over the company to Boudou's business associates four years ago, and that during a meeting where Boudou was present, Carmona explained that to get out of the bankruptcy process, the Ciccone family would have to transfer 70% of Ciccone to Boudou's partners by selling the majority of the company to The Old Fund. Nicolas Ciccone called this "extortion."[20] In a subsequent meeting at which Carmona reiterated his demand, Boudou said that "addressing his friend [Carmona] was like addressing him" and persuaded the Ciccones to agree to their terms.[21] Since the details of Boudou's involvement have surfaced, members of the Ciccone

---

[17]     *Id. at* p. 25.

[18]     *Id. at* p. 78-79.

[19]     Hranitzky Decl. Ex. B at 2.

[20]     Hranitzky Decl. Ex. M; http://www.infobae.com/2013/12/05/1528773-nicolas-ciccone-confirmo-que (visited October 23, 2014).

[21]     *Id.*

family have alleged they have been threatened by people close to Boudou not to disclose anything about the illicit scheme to prosecutors or the public.[22]

At the time the scheme was implemented, Boudou was the Minister of the Economy in Argentina and Forcieri was his chief of staff.[23] According to the report accompanying Boudou's indictment, Forcieri acted on Boudou's behalf and attended meetings related to the Ciccone takeover.[24] Forcieri has vigorously resisted efforts to provide testimony in Argentina regarding Boudou's indictment— repeatedly seeking to delay providing a witness statement based on the claim that his presence was required in the United States to work on matters related to Argentina's (non-existent) negotiations with creditors.[25] His refusal to come to Argentina to give testimony resulted in threats of his arrest in Argentina. On September 5, 2014, an Argentine court indicted Forcieri for his role in Boudou's takeover scheme.[26]

Argentine prosecutors contend that after the takeover, the chief of the advisory council at AFIP, Rafael Resnick, conspired with Boudou to establish a payment plan that would allow Ciccone to extinguish 75% of its tax liabilities—thereby saving Ciccone approximately 180

---

[22] Hranitzky Decl. Ex. N; http://www.theguardian.com/world/2014/jun/08/judge-orders-argentina-vicepresident-amadou-boudou-testify-corruption-scandal (visited October 23, 2014).

[23] Hranitzky Decl. Ex. O; Boudou Indictment at 2, 4, 31; Hranitzky Decl. Ex. P;http://www.infobae.com/2014/06/26/1576029-el-juez-lijo-debe-decidir-si-ordena-detener-o-no-forcieri (visited October 23, 2014)

[24] *Id*. at 4.

[25] Hranitzky Decl. Ex. P; http://www.infobae.com/2014/06/26/1576029-el-juez-lijo-debe-decidir-si-ordena-detener-o-no-forcieri (visited October 23, 2014). According this article, Forcieri's Argentine attorney "cited the 'material impossibility' of Forcieri appearing owing to his duties at the World Bank, which 'require his presence due to various commitments that cannot be postponed at this point in the year.'")

[26] Hranitzky Decl. Ex. B; Poder Judicial de la Nación, Juzgado Criminal y Correccional Federal N° 4, Forcieri Indictment at 1; Hranitzky Decl. Ex. Q; http://www.clarin.com/politica/Caso_Ciccone-Amado_Boudou-Guido_Forcieri-procesamiento-Ariel_Lijo _0_1206479830.html (visited October 23, 2014)

million pesos in taxes.[27]  Just as importantly, by extinguishing Ciccone's tax liabilities, the plan

would cause Ciccone to become eligible to receive lucrative government contracts once again.

Once Ciccone became so eligible, Boudou hoped to award those contracts to Ciccone and

thereby reap enormous profits after he seized control of the company.[28]  Resnick presented the

payment plan to the AFIP director in November 2010.[29]  In an act the Argentine judge

overseeing the case described as "unprecedented in this kind of procedure," Resnick included a

signed opinion letter from Boudou in his capacity as Minister of the Economy, self-servingly

stating that Resnick's proposal was consistent with the government's policies.[30]  Nonetheless, the

AFIP director rejected the proposal.[31]

The following year, when Boudou was elected Vice President of Argentina, Ciccone

solicited approval of the same payment plan with the AFIP.[32]  This time—three days after

Boudou's inauguration as Vice President—the AFIP *approved* the proposal.[33]  As a result of that

approval, Ciccone became eligible for Argentine government contracts from which its owners—

including Boudou—could profit.

---

[27]     Hranitzky Decl. Ex. L; Excerpts of a book authored by Hugo Alconada Mon entitled "Los
Secretos de la Valija," (in translation "Suitcase Secrets") published 2009, Grupo Editorial Planeta
S.A.I.C., at p. 78.

[28]     Hranitzky Decl.  Ex. R; Order for Amado Boudou to testify, issued by Judge Ariel Lijo, May 29,
2014, available at: www.cij.gov.ar/nota-13513-Caso-Ciccone--el-juez-Ariel-Lijo-cit--a-declaraci-n-
indagatoria-al-vicepresidente-Amado-Boudou-.html at p. 2, 4.

[29]     *Id.* at p. 5-6.

[30]     *Id.*

[31]     *Id.*

[32]     *Id.* at p. 6.

[33]     *Id.*

If Boudou, Forcieri or others are convicted of any criminal offense in connection with

this scheme, any funds traceable to that activity may be subject to criminal disgorgement and

therefore constitute property of Argentina that is potentially available to satisfy NML's

judgments.[34]

### C.    Other Investigations Of Boudou

In addition to the Ciccone case, Boudou is also under investigation in Argentina for his

possible role in other illicit schemes.  One such investigation charges both Boudou and Forcieri

with illicit enrichment arising out of various corporate entities in which they held a financial

interest.[35]  The two men were allegedly partners in one or more business ventures currently under

investigation and are alleged to have profited from transactions involving entities they were

responsible for regulating.[36]

Argentine media reports indicate that there are fifty-four lawsuits arising out of Boudou's

conduct while he served as Vice President, Argentina's Economy Minister, or as the head of

*Administración Nacional de la Seguridad Social* ("ANSES"), Argentina's social security

administration,[37] and much of this alleged wrongdoing took place while Forcieri held key

positions working with Boudou at the Economy Ministry and ANSES.  There are at least six

---

[34]    Hranitzky Decl. Ex. S; Argentine Criminal Code, Art. 23.

[35]    Hranitzky Decl. Ex. T; denuncia of Elisa M. A. Carrio and Maximiliano Ferraro with the Anti-Corruption Office of Argentina filed March 27, 2012 available at http://www.elisacarrio.com.ar/index.asp?

[36]    Hranitzky Decl. Ex.U_; http://www.clarin.com/politica/Forcieri-pieza-clave-mayoria-negocios_0_1163883614.html (visited October 23, 2014).

[37]    Hranitzky Decl. Ex. V; http://www.perfil.com/politica/Cuales-son-las-causas-judiciales-que-complican-a-Boudou-20131007-0008.html (visited October 23, 2014).

such cases that remain open in which Boudou is a central party or witness.[38]  Several cases

involve allegations concerning improper political influence by Boudou and involve a complex

web of partnerships that use front men and insider information.

One case involves decisions Boudou made while he ran ANSES.  Boudou allegedly

carried out improper bond swaps using ANSES's so-called "Sustainability Guarantee Fund,"

which resulted in an enormous loss to ANSES of approximately $4.2 billion pesos.  The

transactions involve some of the same brokerages and shell companies that Boudou and his

cronies used as part of their illicit takeover of Ciccone.[39]  At the time, Forcieri worked for

ANSES as the private-sector liaison for the Sustainability Guarantee Fund.[40]

Another case involves whether Boudou, in collusion with Arcadia Advisors and

Gramercy Advisors, used inside information to benefit from Argentina's public debt swap in

2010.  According to investigators, Boudou disclosed inside knowledge of the upcoming swap to

Arcadia and Gramercy—which acted on that information to increase their holdings of defaulted

Argentine debt in anticipation of the swap before the rest of the market had this information, and

while such debt could be purchased relatively cheaply.  Investigators are looking into whether

Boudou himself profited from this scheme.[41]  Forcieri was serving as Boudou's Chief of Staff at

the Ministry of the Economy at the time of the 2010 swap.[42]

---

[38]    Hranitzky Decl. Ex. W; http://www.totalnews.com.ar/content/view/664018/280/ (visited October 23,2014).

[39]    Hranitzky Decl. Ex. X; Claudio Lozano complaint, presented before Judge Ariel Lijo on June 11, 2014, pp. 1, 3.

[40]    Hranitzky Decl. Ex. Y;  http://www.linkedin.com/pub/cesar-guido-forcieri/56/186/a25 (visited October 25, 2014).

[41]    Hranitzky Decl. Ex. Z; http://archivo.losandes.com.ar/notas/2013/7/5/denuncian-boudou-beneficiarse-canje-deuda-724877.asp ("The Nation's Vice-President, Amado Boudou, was today formally

**IV.   NML's Subpoena To Forcieri**

NML served Forcieri with the Subpoena on September 10, 2014.[43]  The Subpoena

requested Forcieri's appearance for a deposition at the offices of Dechert LLP in Washington DC

on October 20, 2014, and sought the production of several discrete categories of documents to be

made at the same location on October 10, 2014, including:

> 1.      Documents regarding Forcieri's relationship with various individuals and entities (listed on Attachment C to the Subpoena) that are believed to the involved in the illicit takeover of Ciccone or other wrongful conduct;
>
> 2.      Documents regarding the transfer of funds involving these individuals and entities;
>
> 3.      Documents regarding communications with these individuals and entities;
>
> 4.      Documents reflecting the structure and operations of these entities;
>
> 5.      Documents reflecting the services provides to the individuals and entities; and
>
> 6.      Documents produced in connection with any inquiry, investigation or indictment of, or litigation or proceeding concerning Argentine Vice President Amado Boudou.

These documents were requested in order to assist NML in identifying assets of

Argentina in the U.S. and elsewhere that may be available to satisfy judgment and claims held by

NML.

Forcieri failed to comply with the Subpoena.  Although he has retained counsel, he

provided no formal response or objections to the Subpoena, and produced only a single

---

accused of alleged abuse of privileged information in the 2010 public debt swap while he was Minister of the Economy.")

[42]     Hranitzky Decl. Ex. Y; http://www.linkedin.com/pub/cesar-guido-forcieri/56/186/a25 (visited October 25, 2014).

[43]     Hranitzky Decl. Ex. C, ¶¶ 32-33.

document.[44] He also failed to appear for the deposition noticed for October 20 without proposing an alternate date on which he is willing to appear.[45] The only excuse offered by Forcieri's counsel for this non-compliance is that Forcieri intends to plead the protections of Fifth Amendment privilege against self-incrimination, and that it would be pointless for him to appear for a deposition at which he would be unwilling to provide sworn testimony.[46]

Reportedly as a result of his recent indictment in Argentina for his alleged involvement in the Ciccone scheme, Forcieri was recently relieved of his position as Executive Director at the World Bank representing Argentina and five other South American nations.[47] He now has imminent plans to leave the United States permanently on November 8, 2014.[48] Once he does so, it will likely become impossible for this Court—or any court in the United States—to compel his compliance with the Subpoena.   Accordingly, in order for NML to have meaningful relief, immediate consideration of this motion is necessary and NML seeks to require Forcieri to remain in the United States until his compliance with the Subpoena is fully resolved.

## ARGUMENT

Federal Rule of Civil Procedure 69(a)(2) authorizes a judgment creditor to serve broad discovery in aid of execution—including discovery about the judgment debtor's assets located outside of the jurisdiction of the court where the subpoena is served or the judgment is rendered.

---

[44] Hranitzky Decl.¶ 40.

[45] *Id.* ¶_36.

[46] *Id.* ¶ 40.

[47] Hranitzky Decl. Ex. AA;  http://www.infobae.com/2014/10/11/1601124-removieron-guido-forcieri-del-banco-mundial-lo-reemplazara-daniel-kostzer (last visited October 26, 2014).

[48] *Id.* at ¶ ¶ 40-41.

NML may therefore seek any information that may lead to assets of Argentina by subpoena served pursuant to Rule 69(a)(2).  This includes any, ill-gotten profits realized from, or funds or other property employed in, the Ciccone scheme—all of which are subject to disgorgement to the Argentine state under Argentine law,[49] and therefore may constitute property of Argentina available to satisfy NML's judgments.

I.      **Forcieri Has Waived Any Objections To The Subpoena.**

Under Federal Rule of Civil Procedure 45, objections to a subpoena calling for the production of documents "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B).  By neither objecting to the Subpoena nor obtaining additional time within which to do so, Forcieri waived any objection he might otherwise have raised to the relevance of the information sought by NML, to the burden that compliance would impose on him, or the ground of privilege. *See In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 124 (D.D.C. 2013) (citing Fed. R. Civ. P. 45) (granting motion to compel third party discovery finding "[a]s an initial matter, the Court notes that a nonparty may respond to a Rule 45 subpoena by 'serv[ing] on the party or attorney designated in the subpoena a written objection' which 'must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served.'"); *Smith v. Mallick,* No. 96-cv-2211, 2006 WL 2571830, at *2 (D.D.C. Sept. 6, 2006) (same); *Tuite v. Henry*, 98 F.3d 1411, 1416 (D.C. Cir. 1996) ("[A] party objecting to a subpoena on the basis of privilege must both (1) object to the subpoena and (2) state the claim of privilege within fourteen days of service.").

---

[49] Hranitzky Decl. Ex, S; Argentine Criminal Code, Art. 23.

**II.   The Information Sought By The Subpoena Is Proper Under Rule 69(a)(2).**

Even if Forcieri had not waived all objections to it, the Subpoena would nonetheless be proper.  Under Rule 69(a)(2), a judgment creditor is entitled to obtain discovery from "*any person*" relating to the judgment debtor's assets "*wherever located*," including "outside the jurisdiction of the court where the discovery request is made." *EM Ltd.*, 695 F.3d at 207-08 (emphasis added, internal citation omitted).  "[F]ederal courts have afforded judgment creditors broad opportunities to discover concealed assets of judgment debtors including acquiring such information from non-parties." *Falicia v. Advanced Tenant Servs., Inc.*, 235 F.R.D. 5, 7 (D.D.C. 2006).  And any "person objecting to production has a heavy burden to show that the subpoena should not be enforced." *Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012).

If Argentine courts find that Boudou seized control over Ciccone illegally for personal gain, then Argentina may confiscate any profits, funds or other property employed in the takeover scheme and such disgorged profits, funds, or other property would be available to partially satisfy NML's judgments.  Under U.S. law, a judgment creditor "may recover assets of the judgment debtor that a third party misappropriated, even where the third party does not possess the funds, because the third party is 'indebted to the judgment debtor.'" *Sullivan v. Ross Mech., Inc.*, No. 10 C 8069, 2012 WL 2254203, at *4 (N.D. Ill. June 15, 2012) (quoting *W. Bend Mut. Ins. Co. v. Belmont State Corp.*, No. 09 C 354, 2010 WL 3700834, at *5 (N.D. Ill. Sept. 9, 2010).  The Argentine Criminal Code also mandates that stolen Argentine assets remain Argentina's property. [50] Thus, any disgorged funds or property potentially would become

---

[50] Hranitzky Decl. Ex. S; Argentine Criminal Code, Art. 23.

property of Argentina available to satisfy NML's nearly $3 billion in judgments and claims

against Argentina.   Accordingly, discovery that may reveal the existence of such funds, such as

the Subpoena at issue here, is necessary and permissible under the broad rules applicable to post-

judgment discovery. [51]

Applying these rules, courts in this district and elsewhere commonly allow judgment

creditors to conduct discovery of information from parties and non-parties alike—including

information from non-parties when "reasonable doubts have been raised concerning the good

faith of the transfer of assets between the [judgment debtor and the non-party]." *Falicia v.

Advanced Tenant Servs., Inc.*, 235 F.R.D. at 7-8 (internal quotation and citation omitted); *see

also Fudali v. Pivotal Corp.*, No. 03-1460, 2010 WL 4910263, at *3 (D.D.C. Dec. 2, 2010)

(noting that "broad discovery into the movement of money from [judgment debtor] to other

entities" is justified); *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 194 (D.D.C. 2003)

(granting judgment creditor's motion to compel discovery from judgment debtor's law firm).

Judge Griesa of the Southern District of New York, before whom the litigation between NML

and Argentina has been pending for over 12 years, has ruled repeatedly that NML is entitled

under the Federal Rules to broad discovery in aid of its judgment enforcement efforts. *See, e.g.*,

Transcript of hearing *EM Ltd. and NML Capital, Ltd. v. Argentina* 03 CV 02507 (TPG)

conducted on Feb. 2, 2007 annexed to the Hranitzky Decl. as Ex. BB at 25 ("[P]laintiffs in these

actions should be allowed some liberality in exploring means of enforcing their judgments.").

---

[51] The fact that Forcieri is seeking to avoid his obligations under the Subpoena only serves to underscore that the requested discovery is highly likely to be a fruitful source of information as to the location of attachable assets.  Forcieri clearly has something to hide and NML is entitled to uncover just what that is through this Subpoena.

This rule was reinforced in a recent 7-1 decision of the United States Supreme Court which specifically addressed the proper scope of discovery available to a judgment creditor in an action against a foreign sovereign. *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014). The order at issue in that case compelled discovery from two non-party banks over objections made by Argentina based on the Foreign Sovereign Immunities Act ("FSIA"). *Id.* at 2253-54. The Supreme Court rejected Argentina's arguments, holding that the FSIA does not limit "the scope of discovery available to a judgment creditor in a federal post judgment execution proceeding against a foreign sovereign." *Id.* at 2253-58. Because the FSIA does not limit post-judgment discovery concerning a sovereign debtor, and because the "rules governing discovery in postjudgment execution proceedings are quite permissive," (*id.* at 2254), the Supreme Court held that NML may properly "ask for information about Argentina's worldwide assets generally, so that NML can identify where Argentina may be holding property that *is* subject to execution." *Id.* at 2258 (emphasis in original). That is precisely the type of information that NML seeks from Forcieri.

A motion to compel non-party discovery in aid of execution involving similar facts was recently decided in favor of NML by a District Court in Nevada. *NML Capital Ltd. v. Republic of Argentina*, No. 2:14-cv-492-RFB-VCF, 2014 WL 3898021 at *3 (D. Nev. Aug. 11, 2014). The court there authorized NML's broad use of third-party subpoenas to locate Argentina's assets, recognizing that NML's efforts to obtain discovery in aid of execution on its judgment against Argentina "is not a run-of-the-mill discovery dispute." *Id.* at *11. In that case, NML served subpoenas on 123 Nevada entities affiliated with Lázaro Báez, an Argentine suspected of embezzlement and money laundering, in an effort to locate assets of Argentina. The Nevada

court found that NML satisfied its burden of showing a connection between the subpoenaed

parties and Argentina by demonstrating a "reasonable suspicion" of transfers between these 123

entities and Argentina. *Id.* at *5. The court also found that the 123 entities failed to provide a

satisfactory excuse for their non-compliance with the subpoena because they did not dispute that

the information sought was relevant, did not contend that the requests were overbroad or unduly

burdensome, made only a conclusory assertion that no responsive documents exist and waived

the right to object to the subpoena by failing to respond within 14 days of service. *Id.* at *7. It

thus granted NML's motion to compel and ordered the Báez entities to provide the requested

discovery.

### III.   Forcieri's Intention To Invoke His Fifth Amendment Privilege Does Not Excuse Him From Complying With The Subpoena.

Forcieri's counsel has stated that Forcieri plans to invoke his privilege against self-

incrimination under the Fifth Amendment to the United States Constitution, and that Forcieri

therefore will not appear for a deposition or make any further production of documents.[52]

However, Forcieri bears the burden to come forward "with credible reasons why revealing such

information presents more than a frivolous fear of incrimination." *SEC v. Parkersburg Wireless

LLC,* 156 F.R.D. 529, 537 (D.D.C. 1994) (quoting *In re Connelly*, 59 B.R. 421, 435 (Bankr. N.D.

Ill.1986)). He cannot establish a factual basis for the applicability of this privilege to the

information and documents sought by NML through the Subpoena.

While the Fifth Amendment may excuse Forcieri from responding to particular questions

he may be asked at deposition, it does not relieve him of the obligation to appear altogether.

Rather, "the only way the privilege can be asserted is on a question-by-question basis, and thus

---

[52] Hranitzky Decl. ¶¶ 41-42.

as to each question asked the party has to decide whether or not to raise his Fifth Amendment

right." *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1019 (9th Cir. 2006); *see also Fulmer v.*

*Bullard*, 842 F.2d 1290, 1290 n.1 (4th Cir. 1988) ("Proper invocation of the fifth amendment

privilege requires its assertion with respect to specific questions."). As explained in Wright &

Miller:

> If a deposition is sought, the availability of the privilege is not a ground for
> vacating the notice of the deposition. The proper procedure is for the deponent to
> attend the deposition, to be sworn under oath, and to answer those questions he or
> she can answer without running the risk of incrimination. In this way a record can
> be made and the court can determine whether particular questions asked did
> entitle the deponent to claim the privilege.

Wright & Miller , 8 Fed. Prac. & Proc. Civ. § 2018 (3d ed.).  Accordingly, NML must be

permitted to depose Forcieri and have the opportunity to pose specific questions to him, in

response to which he may (or may not) choose to invoke the Fifth Amendment.  Once the

deposition is conducted and a transcript is available, the Court will have a record on which to

determine whether the Fifth Amendment privilege was properly invoked.

Nor does Forcieri's planned invocation of his Fifth Amendment privilege categorically

excuse him from producing documents in response to the Subpoena.  Rather, any claim of

privilege must be made on a document by document basis.  *See Cadlerock Joint Venture L.P. v.*

*MacPherson*, No. 09 Civ. 9970, 2011 WL 1795312, at *2 (S.D.N.Y. May 4, 2011) ("the witness

must bring his records to the deposition and then claim the Fifth Amendment privilege for each

document.").  Moreover, the Fifth Amendment is applicable to documents only if the act of

production is "testimonial" in nature.  "[T]he act of production privilege prohibits compelled

disclosure of documents when the act of production has independent communicative aspects—

such as an admission that the documents exist, that the subject possesses or controls the

documents, that the documents are authentic, or that the subject believes the documents are responsive to the subpoena." *In re Various Grand Jury Subpoenas*, 924 F. Supp. 2d 549, 552 (S.D.N.Y. 2013); *see also U.S. v. Hubbell*, 530 U.S. 27, 36 (2000) ("[T]he act of producing documents in response to a subpoena may have a compelled testimonial aspect. We have held that the 'act of production' itself may implicitly communicate 'statements of facts.' By 'producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control and were authentic.'"). It is a "settled proposition that a person may be required to produce specific documents even though they contain assertions or fact or belief because the creation of those documents was not 'compelled' within the meaning of the privilege." *Hubbell*, 425 U.S. at 35-36.

## IV. The Court Should Hold Forcieri In Contempt And Enjoin Him From Leaving The United States Until He Fully Complies With The Subpoena.

Forcieri was served with the Subpoena nearly two months before his planned November 8 departure from the United States, and had more than ample opportunity to respond to the narrowly tailored document requests and appear for the deposition as noticed on October 20. The Court should exercise its authority to ensure compliance with the Subpoena by holding Forcieri in contempt and requiring him to delay his return to Argentina until such time as he has fully complied with the Subpoena.

Rule 45(g) of the Federal Rules of Civil Procedure confers authority to hold a non-party that fails to comply with a subpoena in contempt. The rule empowers "[t]he court for the district where compliance is required . . . [to] hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." The Court has the power under Rule 45 to impose contempt simply on the basis of the subpoenaed party's failure to

comply. *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1364 (2d Cir. 1991). "[E]ven where compliance is difficult," an order of contempt is appropriate for failure to comply with a subpoena, because "the contemnor must show that it has done everything in its power to comply with the court's order." *Walker v. Ctr. for Food Safety*, 667 F. Supp. 2d 133, 137 (D.D.C. 2009).

Here, the only "obstacles" to compliance Forcieri has identified are an improper categorical invocation of his Fifth Amendment privilege, and his plans to permanently return to Argentina in less than one week. Neither of these "obstacles" in any way prevented him from appearing for a deposition on October 20, as specified in the Subpoena or producing responsive documents on or before October 10. Courts in this District have recognized that a potential deponent's preparation to leave the country for an indefinite or lengthy period of time creates an impermissible risk that the testimony sought to be preserved by the deposition will become unavailable. *See e.g.*, *In re Boland*, 79 F.R.D. 665, 667 (D.D.C. 1978) (stating that a deponent that is "preparing to leave the country for an indefinite or lengthy period of time" creates a substantial danger that testimony sought to be preserved by the deposition would otherwise become available). Here, the Court's immediate intervention is critical, as Forcieri intends to leave the United States permanently on November 8, 2014 and NML will lose all ability to enforce his compliance with the Subpoena if immediate action is not taken.

NML respectfully requests that, in addition to compelling him to comply with the Subpoena, the Court exercise its broad contempt powers to order Forcieri to relinquish his passport and stay in the United States until he has done so. *See Herbstein v. Bruetman*, 241 F.3d 586, 588-89 (7th Cir. 2001) (finding the Court's contempt power includes the power to seize a party's passport); *Philips Med. Sys. Int'l, B.V. v. Bruetman*, 982 F.2d 211, 212 (7th Cir. 1992)

(affirming District Court that ordered defendant to remain in the country to complete discovery obligations and deposition); *U.S. v. Brumfield*, 188 F.3d 303, 305 (5th Cir. 1999) (affirming the District Court's contempt order of the defendant that included incarceration and surrender of his passport). *U.S. v. Barnette*, 129 F.3d 1179, 1182 (11th Cir. 1997) (denying an appeal by the contemnors of the district court's contempt order that included surrender of one defendant's passport). *See also Merrill Lynch Bus. Fin. Servs., Inc. v. Kupperman*, No. 06–4802, 2007 WL 2300737, at * 2 (D.N.J. Aug. 7, 2007) (noting a passport may be seized in civil litigation if the individual has "demonstrated a propensity to leave the country when the heat is turned up."); *Mellott v. MSN Commc'ns*, Inc., No. 09-2418, 2010 WL 5110136 (D. Colo. Dec. 8, 2010) (requiring party to surrender passport after failing to comply with court orders and appear for hearings); *In re Krause*, 367 B.R. 740, 776-77 (Bankr. D. Kan. 2007) (ordering a passport seizure to keep a contemnor from fleeing the jurisdiction); *In re Guyana Dev. Corp.*, 201 B.R. 462, 466 (Bankr. S.D. Tex. 1996) (ordering a passport seizure of a debtor's principal after finding him in civil contempt); *Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc.*, No. 05-1532, 2007 WL 3101248 (D. Nev. Oct. 16, 2007) (passport surrender ordered after defendant's continued violation of court orders).   The Court's seizure of Forcieri's passport is the only way to ensure his continued presence in the United States in order to satisfy his discovery obligations.

## CONCLUSION

For the foregoing reasons, NML respectfully requests that the Court find Forcieri in contempt and compel him to comply fully with the Subpoena before leaving the United States by ordering him to relinquish his passport until he does so.

Dated: November 4, 2014

DECHERT LLP

By: _____
       Dennis H. Hranitzky
       dennis.hranitzky@dechert.com
       (Bar No. NY0117)
       Debra D. O'Gorman
       debra.ogorman@dechert.com
       1095 Avenue of the Americas
       New York, New York  10036
       Tel. (212) 698-3500
       Fax. (212) 698-3599

STINSON LEONARD STREET LLP

By: _____
       Steven K. White
       steven.white@stinsonleonard.com
       (Bar No. 367371)
       Lawrence P. Block
       lawrence.block@stinsonleonard.com
       (Bar No. 452190)
       1775 Pennsylvania Ave. NW, Suite 800
       Washington, DC 20006-4605
       Tel: (202) 728-3024
       Fax: (202) 572-9963

*Attorneys for Plaintiff*
*NML Capital, Ltd.*

15407913.13

25